SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED
NOV 30 2018

NOTICE TO DEFENDANT:
(AVISO AL DEMANDADO):
BRANDSAFWAY SERVICES LLC, formerly known as MOBLEY SAFWAY SOLUTIONS, INC., a Georgia corporation; Does 1-10

YOU ARE BEING SUED BY PLAINTIFF:
(LO ESTÁ DEMANDANDO EL DEMANDANTE):

CHEVRON U.S.A. INC., a Pennsylvania corporation

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
(El nombre y dirección de la corte es):
Superior Court of California, County of Contra Costa
725 Court Street, Martinez, CA 94553

CASE NUMBER:
(Número del Caso):
C18-02433

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Matthew J. Blaschke, Esq., 101 Second Street, Suite 2300, San Francisco, CA 94105, (415) 318-1200

DATE: (Fecha) NOV 30 2018 Clerk, by (Secretario) ______________________, Deputy (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

[SEAL]

NOTICE TO THE PERSON SERVED: You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): BrandSafway Services LLC, formerly known as Mobley Safway Solutions, Inc. a Georgia corporation

under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other (specify):
4. ☐ by personal delivery on (date):

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov



**Secretary of State** 1505

**Registered Corporate Agent for Service of Process Certificate**

(Registered Corporations ONLY)

A0814474

FILED

Secretary of State
State of California

JUN 11 2018

**IMPORTANT — Read Instructions before completing this form.**

**Filing Fee –** $30.00

**Copy Fees –** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**Who Can File?** Any active corporation that is registered with the California Secretary of State can file this Form 1505 to become authorized to be a corporate agent for service of process for other business entities that are registered with the Secretary of State. To check the status of your corporation, and to ensure you are entering the **exact** name of the corporation and the **correct** 7-digit Secretary of State file number, go to *BusinessSearch.sos.ca.gov.*

This Space For Office Use Only

**1. Corporate Name** (Enter the exact name of the corporation as it is recorded with the California Secretary of State.)

THE CORPORATION COMPANY

**2. 7-Digit Secretary of State File Number**

C2172119

Personal Service to:

**3. Address for Service of Process** (Enter the complete street address in California of the office where any entity that named your corporation as agent for service of process may be served with process.)
Do not enter a P.O. Box or "in care of" an individual or entity.

| Street Address - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 555 CAPITOL MALL STE 1000 | SACRAMENTO | CA | 95814 |

**4. Authorized Employees** (Enter the names of all persons employed by your corporation who are authorized to accept delivery of any copy of service of process, at the address entered in Item 3 above, on any entity who has designated your corporation as its agent for service of process. Must enter at least 1 person. If there are more than 3, see instructions.)

| First Name of Authorized Employee | Middle Name | Last Name | Suffix |
|---|---|---|---|
| a. Rebecca | | Vecente | |
| b. Brandy | | Cooper | |
| c. Ida | | Jackson | |

**5. Statement of Consent** (Do not alter the Statement of Consent.)

This corporation consents that delivery of a copy of service of process to an authorized employee at the address designated in item 3 shall constitute delivery of any such copy to the corporation, as the agent for service of process.

**6. Read and Sign Below** (See instructions. Office or title not required. Do not use a computer generated signature.)

I am a corporate officer and am authorized to sign on behalf of the corporation.

[signature]
Signature

Marie Hauer
Type or Print Name

2017 California Secretary of State
www.sos.ca.gov/business/be

A0814474

**Attachment to Form 1505**

Kemeshia Johnson
Remy Jeung
Ansori Mohamad
Robin Bell
Sofia Smith
Barbara Lowes
Jennifer Churchill

SUPERIOR COURT - MARTINEZ
COUNTY OF CONTRA COSTA
MARTINEZ, CA, 94553

CHEVRON VS. BRANDSAFWAY

NOTICE OF CASE MANAGEMENT CONFERENCE CIVMSC18-02433

1. NOTICE: THE CASE MANAGEMENT CONFERENCE HAS BEEN SCHEDULED FOR:

DATE: 04/19/19 DEPT: 33 TIME: 8:30

THIS FORM, A COPY OF THE NOTICE TO PLAINTIFFS, THE ADR INFORMATION SHEET, A BLANK CASE MANAGEMENT CONFERENCE QUESTIONNAIRE, AND A BLANK STIPULATION FORM ARE TO BE SERVED ON OPPOSING PARTIES. ALL PARTIES SERVED WITH SUMMONS AND COMPLAINT/CROSS-COMPLAINT OR THEIR ATTORNEY OF RECORD MUST APPEAR.

2. You may stipulate to an earlier Case Management Conference. If all parties agree to an early Case Management Conference, please contact the Court Clerk's Office at (925)608-1000 for Unlimited Civil and Limited Civil cases for assignment of an earlier date.

3. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference and to discuss the suitability of this case for the EASE Program, private mediation, binding or non-binding arbitration, and/or use of a Special Master.

4. At any Case Management Conference the court may make pretrial orders including the following:

a. an order establishing a discovery schedule
b. an order referring the case to arbitration
c. an order transferring the case to limited jurisdiction
d. an order dismissing fictitious defendants
e. an order scheduling exchange of expert witness information
f. an order setting subsequent conference and the trial date
g. an order consolidating cases
h. an order severing trial of cross-complaints or bifurcating issues
i. an order determining when demurrers and motions will be filed

SANCTIONS

If you do not file the Case Management Conference Questionnaire or attend the Case Management Conference or participate effectively in the Conference, the court may impose sanctions (including dismissal of the case and payment of money).

Clerk of the Superior Court of Contra Costa County
I declare under penalty of perjury that I am not a party to this action, and that I delivered or mailed a copy of this notice to the person representing the plaintiff/cross-complainant.

Dated: 11/30/18

A. GRAHAM
Deputy Clerk of the Court

Scanned by CamScanner

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Charles C. Correll, Jr., Esq. (SBN 236085), Matthew J. Blaschke, Esq. (SBN 281938)
KING & SPALDING, LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
TELEPHONE NO.: (415) 318-1200 FAX NO.: (415) 318-1300
ATTORNEY FOR (Name): Plaintiff, CHEVRON U.S.A. INC.

FOR COURT USE ONLY

FILED
NOV 30 2018

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Contra Costa
STREET ADDRESS: 725 Court Street
MAILING ADDRESS: 725 Court Street
CITY AND ZIP CODE: Martinez, CA 94553
BRANCH NAME: Wakefield Taylor Courthouse

CASE NAME:
CHEVRON U.S.A. INC. v. BRANDSAFWAY SERVICES L.L.C.

## CIVIL CASE COVER SHEET

| | |
|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) |

Complex Case Designation
☐ Counter ☐ Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: C18-02433

JUDGE:

DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☑ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition (not specified above) (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   - a. ☐ Large number of separately represented parties
   - b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   - c. ☐ Substantial amount of documentary evidence
   - d. ☐ Large number of witnesses
   - e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   - f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought (*check all that apply*): a. ☑ monetary b. ☐ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action (*specify*):
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: November 29, 2018
Richard V. Normington (for Matthew J. Blaschke)
(TYPE OR PRINT NAME) (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CHARLES C. CORRELL, JR. (State Bar No. 258085)
*ccorrell@kslaw.com*
MATTHEW J. BLASCHKE (State Bar No. 281938)
*mblaschke@kslaw.com*
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone: +1 415 318 1200
Facsimile: +1 415 318 1300

Attorneys for Plaintiff
CHEVRON U.S.A. INC.

FILED
NOV 30 2018

PER LOCAL RULE, THIS CASE IS ASSIGNED TO DEPT 22 FOR ALL PURPOSES.

SUMMONS ISSUED

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF CONTRA COSTA

| | |
|---|---|
| CHEVRON U.S.A. INC., a Pennsylvania corporation,<br><br>Plaintiff,<br><br>v.<br><br>BRANDSAFWAY SERVICES LLC, formerly known as MOBLEY SAFWAY SOLUTIONS, INC., a Georgia corporation; Does 1-10<br><br>Defendants. | Case No. C18-02433<br><br>COMPLAINT FOR:<br><br>1. BREACH OF CONTRACT;<br>2. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; AND<br>3. UNJUST ENRICHMENT.<br><br>JURY TRIAL DEMANDED. |

## INTRODUCTION

1. This action stems from Defendant BrandSafway Services LLC's, formerly known as Mobley Safway Solutions, Inc., ("Mobley") breaches of the Master Products and Services Agreement entered into with Plaintiff Chevron U.S.A. Inc. ("Chevron U.S.A." or "Chevron"), whereby Mobley (i) overcharged Chevron U.S.A. by double-billing third-party invoices, (ii) charged Chevron U.S.A. for labor and services not actually provided, (iii) charged Chevron U.S.A. erroneous and inflated labor rates for work performed, (iv) charged vehicle lease rates to Chevron U.S.A. for use of personal vehicles prohibited by their agreement, and (v) failed to treat Chevron U.S.A. as its "Most Favored Customer" as required by the parties' Agreement. Mobley's wrongful conduct was meant to, and did, cause it to be unjustly enriched in the amount of at least $2 million at Chevron U.S.A.'s expense.

## JURISDICTION AND PARTIES

2. This Court has subject-matter jurisdiction and jurisdiction over the parties, pursuant to the agreement of the Parties, as set forth in Paragraph 8, *infra*.

3. Chevron U.S.A. at all times relevant to this litigation was and is an entity duly authorized to do business in the State of California and the County of Contra Costa with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583.

4. Chevron U.S.A. is informed and believes, and upon such information and belief alleges, that Defendant BrandSafway Services LLC is a Georgia limited liability corporation, formerly known as Mobley Safway Solutions, Inc. and, before that, as Mobley Industrial Services, Inc. ("Mobley"), with its principal place of business in Kennesaw, Georgia. For purposes of these proceedings, Defendant will be referenced as "Mobley." Chevron U.S.A. and Mobley are collectively referred to as the "Parties."

5. Chevron U.S.A. is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10 and therefore sues those Defendants by such fictitious names. Chevron U.S.A. will amend this Complaint to show the true names and capacities of each fictitiously named Defendant when such identities become ascertained. Chevron U.S.A. is informed and believes, and thereon alleges, that each fictitiously named Doe Defendant is responsible for, or in some way

participated in, the acts and conduct hereinafter alleged, and that each is therefore liable, jointly and severally with each other, for the damages and other relief. Chevron U.S.A. is further informed and believes, and thereon alleges, that at all times relevant herein, each Doe Defendant was the agent, servant and employee of each other, was acting within the scope of such agency or employment, and that each Doe Defendant ratified and affirmed the acts of each of the other Defendants.

## FACTUAL AVERMENTS

### Master Products and Services Agreement

6. On February 15, 2012, Mobley entered into the Master Products and Services Agreement (the "Agreement") with Chevron U.S.A. to provide blasting and coating products and services to Chevron U.S.A. at its petroleum refinery in Pascagoula, Mississippi for a term of five years.

7. Pursuant to the terms of the Agreement, Mobley was the primary blasting and coating contractor for Chevron U.S.A.'s Tank Maintenance Program at Chevron U.S.A.'s Pascagoula Refinery. By entering into the Agreement, Mobley expressly agreed to provide Chevron U.S.A. blasting and coating products and services at its Pascagoula Refinery for a term of five years pursuant to the following terms (without limitation):

> **4.1 General - Prices/Rates.** Chevron shall pay Supplier in accordance with the rates and/or prices set forth in this Agreement as full compensation for all Products furnished and/or Services performed under this Agreement. Prices and rates are exclusive of Transaction Taxes and import duties.
>
> **4.2 Product Prices.** The Parties agree that prices, rates and fees for any Products shall be identified in a separate writing and will be attached hereto as an Exhibit, stated in the Purchase Order and/or agreed in a separate written communication between the Parties.
>
> **4.3 Service Rates.** The Parties agree that prices, rates and fees for any Services shall be identified in a separate writing and will be attached hereto as an Exhibit, stated in the Purchase Order and/or agreed in a

separate written communication between the Parties.

...

**4.6 Most Favored Customer.** Supplier shall treat Chevron as Supplier's most favored commercial (i.e., non-governmental) customer. Supplier represents and warrants that the net rates and contractual provisions for Products and/or Services furnished to Chevron under this Agreement and any Purchase Order are not and shall not be less favorable than the rates and provisions offered to any of Supplier's other commercial customers for similar products and/or services. If Supplier offers lower rates or more favorable provisions to any such customer than are offered to Chevron under this Agreement or any Purchase Order for similar products and services, then Supplier shall concurrently extend such rates or provisions to Chevron, and this Agreement and any applicable Purchase Order, at Chevron's option, shall be deemed amended to have provided such terms to Chevron as of the offer date to such customer. Any amounts charged to Chevron in excess of rates charged by Supplier to any other commercial customer for similar Products or Services shall promptly be refunded or credited to Chevron by Supplier. Supplier will provide access to its records to a third party auditor selected by Chevron (who shall be subject to appropriate confidentiality) for purposes of verifying compliance with this Section, if requested by Chevron.

(See Attachment, Master Services Agreement)

8. The Agreement also made clear that it "shall be governed, construed, interpreted, enforced and the relations between the Parties determined in accordance with the laws of the state of California without regard to its choice of law rules." Further, the Agreement provided that Chevron U.S.A. and Mobley "irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of either (a) Contra Costa County in the State of California, or (b) the federal court of the Northern District of California, for any actions, suits or proceedings arising

out of or relating to this Agreement (and the Parties each agree not to commence any action, suit or proceeding relating thereto except in such courts)."

**Chevron U.S.A.'s Discovery of Mobley's Breaches of the Agreement**

9. Following the discovery in January 2017 of unexpectedly high billings for December 2016, Chevron U.S.A. immediately initiated an audit of Mobley's billing and invoicing practices for the life of the Agreement from February 2012 through February 2017 (the "Audit"). Prior to the unexpectedly high billings for work purportedly performed in December 2016, Chevron U.S.A. had no reason to suspect Mobley had breached the Agreement.

10. Chevron U.S.A. completed its audit in July of 2017. The audit revealed that Mobley breached the foregoing sections of the Agreement by overcharging Chevron U.S.A. through: (1) double-billing third-party invoices, (2) charging Chevron U.S.A. for labor and services not actually provided, (3) charging Chevron U.S.A. erroneous and inflated labor rates for work performed, (4) charging vehicle lease rates to Chevron U.S.A. for use of personal vehicles, and (5) by failing to treat Chevron U.S.A. as its "Most Favored Customer" as it was obligated to do under the Agreement.

11. More specifically, Mobley overcharged Chevron U.S.A. in breach of its Products Prices and Services Rates obligations in the amount of nearly $80,000 based on duplicative invoice billing alone.

12. Additionally, at the conclusion of the Audit in July 2017, it was determined that Mobley billed Chevron U.S.A. approximately $2,250 per month for the use of third-party blast pots even though the rental average ranges from $1,200-$1,300 per month. Chevron U.S.A. also identified nine instances in which the rental periods overlapped for a specific blast pot causing duplicative overbilling to Chevron U.S.A. Mobley's failure to treat Chevron U.S.A. as its "Most Favored Customer" pursuant to the Agreement's terms and its duplicative overbilling has caused harm to Chevron U.S.A. of nearly $300,000.

13. Mobley breached its "Most Favored Customer" obligation in several other respects. For example, Mobley (1) exceeded the lowest customer rate by charging Chevron U.S.A. $2.27 an hour more in straight time for the "Painter A" position; (2) exceeded the lowest customer rate by

charging Chevron U.S.A. $3.80 an hour more in straight time for the "QA/QC Manager" position; (3) exceeded the lowest customer rate by charging $3.80 an hour more in straight time for "Health & Safety Manager" position; and (4) exceeded the lowest customer rate for "VAN, ½ & ¾ TON (DRY)" by $300 per month. (See Attachment, Master Services Agreement at Exhibit A). Mobley's breaches of the Agreement by failing to abide by its Most Favored Customer Obligations caused more than $505,000 in harm to Chevron U.S.A.

14. Mobley likewise overbilled Chevron U.S.A. for its purported labor hours. Specifically, Mobley overbilled Chevron U.S.A. for hours its employees did not work. Indeed, a comparison of the hours Mobley billed to Chevron U.S.A. to Mobley's actual payroll data confirms Mobley charged Chevron U.S.A. $250,000 more for purported labor hours than hours actually worked by Mobley employees.

15. Similarly, Mobley overbilled Chevron U.S.A. in breach of the Agreement by misclassifying its employees' titles, skill levels, and certifications (or lack thereof). For example, Mobley misclassified some of its employees to bill at the higher "Planner, Maintenance" rate rather the "Clerical, Administration" rate to overcharge Chevron U.S.A. and increase Mobley's own profits. Mobley likewise identified many of its painter and scaffold erector employees as "Level A" rather than the lower "Level B" or "Level C" when the tasks performed did not warrant a higher classification to again increase its profits by overbilling Chevron U.S.A. Mobley additionally billed Chevron U.S.A. for employees with an alleged National Center for Construction Education and Research (NICER) certification when, in several instances, the employees who actually performed the work were not, in fact, NCCER certified. These misclassifications of titles, skill levels, and certifications breached the Agreement and caused Mobley to be unjustly enriched at Chevron U.S.A.'s expense in excess of $508,000.

16. Finally, Mobley charged Chevron U.S.A. for reimbursement of Mobley employees' use of their personal vehicles in breach of the Agreement. The Agreement provides that Mobley will only be reimbursed for vehicle use under the Agreement where Mobley is the leaseholder or owner of vehicles being used on Chevron U.S.A.'s Pascagoula Refinery property. By billing Chevron U.S.A. for Mobley employees' personal use of their own vehicles, Mobley breached the

Agreement and unjustly profited more than $277,000 during the life of the Agreement.

17. The above-noted breaches could not have been detected during the ordinary course of business without the audit Chevron U.S.A. initiated in January 2017 because Mobley was in a superior position in its knowledge of the breaches of which it knew Chevron U.S.A. was ignorant. For example (and without limitation), Chevron U.S.A. had no way of knowing through the ordinary course of business that Mobley was: (1) misclassifying its employees' titles, skill levels, and certifications (resulting in the overcharges referenced in Paragraph 15, *supra*), (2) improperly charging Chevron U.S.A. for work not actually performed, (3) improperly charging Chevron U.S.A. for Mobley employees' use of their personal vehicles, or (4) that Mobley had charged Chevron U.S.A. more than the "lowest customer rate" for various equipment and services as noted in Paragraph 13, *supra*.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Against All Defendants and Does 1-10)**

18. Chevron U.S.A. incorporates paragraphs 1 through 17 above as though fully set forth herein.

19. Chevron U.S.A. performed all obligations to Mobley required of it under the Agreement.

20. As set forth herein, Mobley breached the Agreement by overcharging Chevron U.S.A. via double-billing third-party invoices, charging Chevron U.S.A. for labor and services not actually provided, charging Chevron U.S.A. erroneous and inflated labor rates for work performed, by charging vehicle lease rates to Chevron U.S.A. for use of personal vehicles, and by failing to treat Chevron U.S.A. as its "Most Favored Customer" as required by the Agreement.

21. As a direct and proximate result of Mobley's breaches of the Agreement, Chevron U.S.A. suffered extensive financial harm in in the amount of at least $2 million.

22. Based on Mobley's actions as alleged herein, Chevron U.S.A. is entitled to and does seek damages caused by Mobley's breaches to the Agreement, plus any interest provided by law, as well as its fees and costs as afforded by Section 7.6 of the Agreement.

## SECOND CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(Against All Defendants and Does 1-10)**

23. Chevron U.S.A. incorporates paragraphs 1 through 22 above as though fully set forth herein.

24. Chevron U.S.A. performed all obligations to Mobley required of it under the Agreement.

25. An implied covenant of good faith and fair dealing existed between Chevron U.S.A. and Mobley not to take any action that would interfere with the other party's enjoyment of the benefits of the Agreement.

26. Mobley breached the implied covenant of good faith and fair dealing by its overcharging of Chevron U.S.A. via double-billing third-party invoices, charging Chevron U.S.A. for labor and services not actually provided, charging Chevron U.S.A. erroneous and inflated labor rates for work performed, charging vehicle lease rates to Chevron U.S.A. for use of personal vehicles, and by failing to treat Chevron U.S.A. as its "Most Favored Customer." Mobley thus unfairly interfered with Chevron U.S.A.'s right to receive the benefits owed to it under the Agreement.

27. Chevron U.S.A. was harmed by Mobley's conduct and breach of the implied covenant of good faith and fair dealing.

28. Chevron U.S.A. owned the amounts Mobley wrongfully obtained from Chevron U.S.A. via its breaches of the implied covenant of good faith and fair dealing as alleged herein.

29. Mobley intentionally and substantially interfered with Chevron U.S.A.'s right to the amounts Mobley wrongfully obtained from Chevron U.S.A. when it took possession of at least $2 million owed to Chevron U.S.A. by double-billing third-party invoices, charging Chevron U.S.A. for labor and services not actually provided, charging Chevron U.S.A. erroneous and inflated labor rates for work performed, charging vehicle lease rates to Chevron U.S.A. for use of personal vehicles, failing to treat Chevron U.S.A. as its "Most Favored Customer," and

subsequently by failing to return the amounts owed to Chevron U.S.A. despite Chevron U.S.A.'s demand that the amounts owed be returned.

30. Chevron U.S.A. did not consent to Mobley's wrongful acquisition of the amounts owed or Mobley's continued wrongful possession thereof.

31. Mobley's wrongful conduct was meant to, and did, cause it to be unjustly enriched in the amount of at least $2 million at Chevron U.S.A.'s expense.

32. Mobley's continued wrongful possession of the amounts owed to Chevron U.S.A. is a substantial factor in the harm caused to Chevron U.S.A.

**THIRD CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(Against All Defendants and Does 1-10)**

33. Chevron U.S.A. incorporates paragraphs 1 through 32 above as though fully set forth herein. Mobley received at least $2 million meant for the use and benefit of Chevron U.S.A. by double-billing third-party invoices, charging Chevron U.S.A. for labor and services not actually provided, charging Chevron U.S.A. erroneous and inflated labor rates for work performed, charging vehicle lease rates to Chevron U.S.A. for use of personal vehicles, and by failing to treat Chevron U.S.A. as its "Most Favored Customer."

34. The amounts Mobley wrongly obtained have not been returned to Chevron U.S.A. despite Mobley knowing the amounts are meant for the use and benefit of Chevron U.S.A., thereby causing continued harm to Chevron U.S.A.

35. As an alternative to its First Cause of Action for breach of contract, Chevron U.S.A. seeks restitution of at least $2 million Mobley wrongfully obtained from Chevron U.S.A. in connection with the acts and omissions described above.

**PRAYER FOR RELIEF**

Wherefore, Chevron U.S.A. prays for judgment against Defendants as follows:

1. For declaratory judgment determining the rights and obligations between Chevron U.S.A. and Defendants pursuant to the Agreement, including a declaration that the Agreement constitutes a valid and enforceable contract that must be honored by Defendants;

2. For actual and compensatory damages according to proof;

3. For restitution;

4. For pre- and post-judgment interest thereon as provided by law;

5. For reasonable attorneys' fees and costs of the suit incurred herein; and

6. For any and all such other and further relief that this Court may deem just and proper including all relief provided for in the Agreement.

DATED: November 29, 2018

KING & SPALDING LLP

By: ______________________

Charles C. Correll, Jr.
Matthew J. Blaschke

Attorneys for Plaintiff
CHEVRON U.S.A. INC.

# ATTACHMENT

## Master Products and Services Agreement

*Mobley Industrial Services, Inc.*

**Blanket Service Agreement No. CW859608**

CHEVRON PRODUCTS COMPANY, a division of CHEVRON U.S.A. INC., a Pennsylvania corporation, hereinafter referred to as COMPANY, and the undersigned, hereinafter identified as CONTRACTOR, hereby mutually agree on February 15, 2012, that CONTRACTOR shall perform services for COMPANY at the Pascagoula, MS Refinery in accordance with Scope of Work shown in Compensation Schedule dated February 3, 2012, under the Terms and Conditions hereof, and in accordance with the above Specification. This Blanket Service Agreement (this "Agreement") includes every document listed on the Order of Precedence made with respect to the Agreement, and includes, without limitation, this agreement face sheet (this "Agreement Face Sheet"), the applicable GDS 1000 Master Products and Service Agreement, Terms and Conditions (the "Terms and Conditions") and Specification, all attached hereto. CONTRACTOR shall also perform the work hereunder in accordance with local Addendums for Safety and Procedures, included herein by reference, and not attached hereto, and made a part of this Agreement.

COMPANY will pay CONTRACTOR, in accordance with statements prepared by CONTRACTOR, as compensation determined in accordance with the attached Exhibit "A," dated February 3, 2012 and entitled "Compensation Schedule."

This Agreement shall be commenced on or about 2/15/12, diligently prosecuted, and continue until 2/15/17, unless terminated earlier by either party by giving thirty (30) days prior written notice of termination to the other party.

**Mobley Industrial Services, Inc.**

By [signature]

Title President

Date 2/16/2012

Witness [signature]

Communications to CONTRACTOR should be addressed to the attention of:

Charles Mobley
P.O. Box 596
Deer Park, TX 77536
Phone: 281-470-9120, Fax: 281-470-0426

**CHEVRON PRODUCTS COMPANY, a division of CHEVRON U.S.A. INC.**

By [signature]

Title Procurement Manager

Date 2/14/2012

Communications to COMPANY should be addressed to the attention of:

Christopher G. Skrmetti
250 Industrial Rd.
Pascagoula, MS 39581
Phone: 228-938-4677, Fax: 228-938-4924

**NOTICE: THIS CONTRACT CONTAINS INDEMNITY AND DEFENSE PROVISIONS**

# Master Products and Services Agreement

## GDS 1000

Chevron Contract No. CW859608

---

This **Master Products and Services Agreement** is dated and made effective as of 2/15/12 (the "**Effective Date**"), and is by and between: **Mobley Industrial Services, Inc.** a **Texas Corporation** (hereinafter "**Supplier**") and **Chevron Products Company**, a division of Chevron U.S.A. Inc., a Pennsylvania corporation (hereinafter "**Chevron**").

**NOW, THEREFORE**, the Parties agree as follows:

1. **DEFINITIONS.** As used in this Agreement:

"**Affiliate**" means any entity which controls, is controlled by, or is under common control with another entity. An entity is deemed to control another if it owns directly or indirectly at least 50% of (i) the shares entitled to vote at a general election of directors of such other entity, or (ii) the voting interest in such other entity if such entity does not have either shares or directors.

"**Agreement**" means this Master Products and Services Agreement and all exhibits, annexes, statements of work, other attachments and each applicable Purchase Order.

"**Applicable Law(s)**" means laws, regulations, statutes, codes, rules, orders, licenses, certifications, decrees, standards or interpretations imposed by any governmental authority that apply to or relate in any way to the Products, materials, Services, this Agreement, the Area of Operations or to the country where these Services are performed and/or the Products or materials are delivered.

"**Area(s) of Operation(s)**" means the area or areas where the Services are to be performed or the Products are delivered by Supplier, as specified in a Purchase Order.

"**Delivery Point**" means the Product delivery location identified in the respective Purchase Order.

"**Force Majeure**" means an event or condition that is unforeseeable and is beyond either Party's or its subcontractor's control. Force Majeure may include orders of government agencies; strikes, lockouts and other labor disturbances (even if terminable by the affected Party's acceding to the demands of any labor group); war, riots, terrorism, and civil insurrection; and fires, floods, earthquakes and loss of public utilities beyond the control of the affected Party. Force Majeure shall not include severe weather conditions and other events that are foreseeable by experienced firms familiar with the locality of the job site. By way of example, an event or condition that could have been prevented by Supplier or its subcontractors is not a Force Majeure.

"**Company Group**" means, individually and collectively, Chevron, Chevron's Affiliates, Joint Interest Owners (i.e., any individual, corporation, company or other legal entity, including a co-interest owner, joint venture, partner or co-lessee of Chevron, who shares an economic interest in common with Chevron or Affiliate of Chevron in relation to the Area of Operations) and their Affiliates, and any director, agent, representative or employee of any of them, and the successors and assigns of any of the foregoing (but excludes Chevron's contractors and their subcontractors, and the employees of those contractors and subcontractors.

"**IPR**" means all patents, rights to inventions, copyrights, database rights, trademarks, service marks, design rights, rights in confidential information (including know-how and trade secrets) and any other intellectual property rights, in each case, whether registered or unregistered and including all applications for and all renewals and extensions of such rights.

"**Party(ies)**" means in its singular form Chevron or Supplier, and in its plural form Chevron and Supplier.

"**Personal Data**" means any information that can be used directly or indirectly, alone or in combination with other information, to identify an individual.

"**Products**" means all goods, materials and equipment to be sold by Supplier to Chevron under this Agreement and which may be identified in an Exhibit attached to this Agreement or in a

Purchase Order. Products specifically shall not include equipment to be furnished by Supplier in the performance of Services.

**"Purchase Order"** means the written form utilized by Chevron to request Products and/or Services, which may be titled a Purchase Order or Service Order, as applicable.

**"Services"** means all services, operations and work to be performed by Supplier for Chevron, including Services incidental to the production and delivery of Products and may be identified in a Statement of Work (or SOW) that may be attached as an Exhibit to this Agreement or identified in a Purchase Order.

**"Supplier Group"** means Supplier and Supplier's Affiliates and subcontractors, and the directors, officers, employees and other personnel of all of them, and any individual, corporation, company or other legal entity acting on behalf of them, in connection with any subject matter of this Agreement.

**"Total Cost of Ownership"** means the aggregate of direct costs and indirect costs incurred by both Chevron and Supplier over the life of the Agreement or, where appropriate, the Products and Services. Typical components include, but are not limited to, cost to manufacture (engineering, materials and equipment, labor, procurement costs), cost to install and use (transportation, installation service, testing), cost to maintain (spares, repairs, Service), and cost to retire (removal, disposal).

**"Transaction Taxes"** means any value added tax, goods and services tax, sales tax, other excise taxes and/or other similar taxes.

## 2. SCOPE OF THE AGREEMENT; ORDERS FOR PRODUCTS AND/OR SERVICES.

2.1 **Scope.** It is the intention of the Parties that this Agreement applies to and shall control the provision of all Products and Services by Supplier to Chevron. However, nothing herein shall obligate Chevron to order Products or Services from Supplier in any portion or amount or prevent Chevron from procuring Products and Services from any other suppliers.

2.2 **Purchase Order.** Supplier shall provide the Products and/or perform the Services in accordance with this Agreement and the terms of the applicable Purchase Order. The applicable Purchase Order shall set forth the particulars of the Products to be supplied and/or the Services to be performed. For purposes of further clarity, Supplier shall comply with the specific delivery terms and specific performance terms set out in the applicable Purchase Order and/or any other document that is part of this Agreement (as applicable). Supplier shall not deliver any Product or engage in any Service or other performance without a Purchase Order (or amended Purchase Order) being issued with respect thereto. In the event of any conflict between the body of this Agreement and any exhibit, annex or Purchase Order to this Agreement, the body of this Agreement shall prevail.

2.3 **Refusal to Accept Non-Ordered Products.** Chevron may, in its sole discretion, reject any Products supplied or Services performed for which no Purchase Order has been issued, at any time after becoming aware that the Products and/or Services are not supported by a Purchase Order and refuse to make payment for those Products and/or Services or in the case where Chevron has already paid for the Products and/or Services, the amount paid shall be deemed a debt due and immediately payable by Supplier to Chevron.

2.4 **Time is of the Essence.** Time of performance of Supplier's obligations is of the essence of this Agreement and each Purchase Order.

2.5 **Extension of Terms to Chevron Affiliates.** Supplier agrees to extend the terms of this Agreement to Affiliates of Chevron who elect to purchase Products and/or Services subject to the terms of this Agreement, upon the written request of the Affiliate; provided that the Affiliate of Chevron is within the same country (whereas, if the Affiliate is located outside the country, the Affiliate and Supplier must agree in a separate writing signed by their authorized representatives for this Agreement to govern their relationship). A Purchase Order by an Affiliate of Chevron shall contain an express reference to this Agreement and such Purchase Order shall be deemed to incorporate the terms of this Agreement. If the Affiliate of Chevron and Supplier are located within the same country, Supplier shall be bound to provide the Products and/or Services specified in that

Purchase Order unless otherwise agreed in writing between Supplier and that Affiliate of Chevron. In the event that Chevron or an Affiliate of Chevron issues a Purchase Order for the supply of Products and/or Services pursuant to this Agreement, then Chevron or that issuing Affiliate of Chevron shall be solely liable under and for such Purchase Order and no other Chevron entity shall be liable or responsible for anything relating to that Purchase Order. For purposes of further clarity, Supplier acknowledges and agrees that the original Chevron entity that entered into this Agreement or any other Affiliate of Chevron that did not issue the Purchase Order shall not be jointly, severally or otherwise liable with respect to such Purchase Order, and Supplier hereby irrevocably and unconditionally releases each of those entities from any and all claims, liability, losses, damages, costs and expenses with respect to that Purchase Order. The terms of this Agreement shall be incorporated by reference into each Purchase Order as if this Agreement was separately executed by such Affiliate of Chevron (and solely by such Affiliate of Chevron) with Supplier.

**3. TERM AND TERMINATION.**

**3.1 Term and Termination of the Agreement.**

**3.1.1** This Agreement shall begin as of the Effective Date and shall remain in effect for a period of five (5) years (the "Term") unless earlier terminated by either Chevron or Supplier in accordance with the terms of the Agreement.

**3.1.2** Chevron may terminate this Agreement with or without cause by giving sixty (60) days written notice of termination to Supplier.

**3.1.3** Either Party may terminate this Agreement upon thirty (30) days written notice of termination to the other Party in the event the other Party breaches a material term of this Agreement and the specified breach is incurable or remains uncured at the end of thirty (30) days following the date of such notice.

**3.1.4** Chevron may immediately terminate this Agreement if (a) Supplier commits any unlawful, fraudulent or deceptive acts or practices or criminal misconduct in the performance of this Agreement; (b) Supplier breaches this Agreement with respect to an environmental, health or safety requirement; or (c) Supplier or its creditors seek relief under any bankruptcy or insolvency law.

**3.1.5** Except in the case of termination under Section 3.1.4, the termination of this Agreement shall not affect the rights and obligations of the Parties under Purchase Orders in effect at the time of the receipt of the notice of termination. This Agreement shall remain in effect until the final delivery of the Product or completion of the Services under such Purchase Orders (or until the earlier termination of such Purchase Orders) occurs.

**3.2 Termination of a Purchase Order.** Chevron may terminate any Purchase Order or portions thereof with or without cause at any time by providing Supplier with fifteen (15) days written notice of termination. Upon receipt of such notice, Supplier shall: (i) immediately discontinue the Services and/or fulfillment of the Purchase Order to the extent specified in the notice; (ii) place no further orders relating to the Products or Services other than as may be necessarily required for completion of such portion of the Purchase Order(s) that are not terminated; and (iii) take all commercially reasonable measures to mitigate the effects of termination.

**3.3 Compensation for Terminated Purchase Order.** If Supplier is not in default of its obligations under this Agreement, then Chevron shall pay Supplier the amounts due not previously paid to Supplier for the Services properly performed and for the Products properly furnished pursuant to a Purchase Order prior to such effective date of the termination notice and a reasonable amount for Products then in production, based on a percentage of completion. Such payment shall be subject to any right of offset by Chevron and Supplier's duty to mitigate, including credits for the value of re-stockable or re-sellable Products or components thereof. If Supplier is in default of its obligations under this Agreement, the excess cost necessary for Chevron to complete the Services or obtain the Product from an alternate supplier, as compared to Supplier's prices under the relevant Purchase Order, shall be for the account of Supplier. Such excess cost may be deducted

from the unpaid amount of Supplier's compensation. If such cost exceeds the unpaid amount, Supplier shall promptly reimburse Chevron for such excess cost. Regardless of whether Chevron elects to complete the Services, Supplier shall reimburse Chevron all prior payments made by Chevron for Services performed but which do not meet the requirements of this Agreement or the applicable Purchase Order. The action by Chevron of terminating the Purchase Order and hiring another supplier to complete the Purchase Order shall not constitute a waiver of or election among any other rights or remedies that Chevron may have against Supplier.

3.4 **Post-Termination of Agreement.** In the event of any expiration or earlier termination of this Agreement (and upon written notice thereof), Supplier shall cooperate with Chevron and shall use due diligence and care, reasonable commercial efforts and best industry practices to (a) effect an orderly and timely transition from Supplier to Chevron or Chevron's chosen alternative providers and (b) minimize the interference or impact of such transition upon the operations, business and financial performance of Chevron. Without limitation of the foregoing, Supplier shall deliver to Chevron all property belonging to Chevron in the possession or control of Supplier, its affiliated entities, vendors, contractors or their respective employees or agents.

4. **COMPENSATION AND DISCOUNTS.**

4.1 **General – Prices/Rates.** Chevron shall pay Supplier in accordance with the rates and/or prices set forth in this Agreement as full compensation for all Products furnished and/or Services performed under this Agreement. Prices and rates are exclusive of Transaction Taxes and import duties.

4.2 **Product Prices.** The Parties agree that prices, rates and fees for any Products shall be identified in a separate writing and will be attached hereto as an Exhibit, stated in the Purchase Order and/or agreed in a separate written communication between the Parties.

4.3 **Service Rates.** The Parties agree that prices, rates and fees for any Services shall be identified in a separate writing and will be attached hereto as an Exhibit, stated in the Purchase Order and/or agreed in a separate written communication between the Parties.

4.4 **Revision of Rates and Prices.** Prices and Rates set forth in this Agreement shall remain firm for the Term of this Agreement and may only be revised up or down by mutual written agreement of Chevron and Supplier.

4.5 **Discounts.** All compensation due to Supplier for Products and/or Services under this Agreement shall be subject to the discounts set forth in an attached Exhibit, in a Purchase Order or in some other separate written communication agreed to by the Parties, as may be modified from time to time. The applicable discount shall be the one current as of the date of the applicable Purchase Order.

4.6 **Most Favored Customer.** Supplier shall treat Chevron as Supplier's most favored commercial (i.e., non-governmental) customer. Supplier represents and warrants that the net rates and contractual provisions for Products and/or Services furnished to Chevron under this Agreement and any Purchase Order are not and shall not be less favorable than the rates and provisions offered to any of Supplier's other commercial customers for similar products and/or services. If Supplier offers lower rates or more favorable provisions to any such customer than are offered to Chevron under this Agreement or any Purchase Order for similar products and services, then Supplier shall concurrently extend such rates or provisions to Chevron, and this Agreement and any applicable Purchase Order, at Chevron's option, shall be deemed amended to have provided such terms to Chevron as of the offer date to such customer. Any amounts charged to Chevron in excess of rates charged by Supplier to any other commercial customer for similar Products or Services shall promptly be refunded or credited to Chevron by Supplier. Supplier will provide access to its records to a third party auditor selected by Chevron (who shall be subject to appropriate confidentiality) for purposes of verifying compliance with this Section, if requested by Chevron.

**5. PERFORMANCE; CONTINUOUS IMPROVEMENT AND EPROCUREMENT COMMITMENTS.**

**5.1 Warranties.** Supplier represents, warrants and covenants that:

**5.1.1 Product Warranties.** The Products shall conform to the specifications attached to this Agreement or in the absence of same the Products shall conform to the manufacturer's standard specifications and product claims. Supplier warrants that it has transferable title to the Products and that the Products shall be free from encumbrances and defects in design, workmanship and materials. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR USE OR OTHERWISE.

**5.1.2 Service Warranties.** The Services shall conform to the service levels set forth in this Agreement (including an exhibit or Purchase Order). Supplier shall perform the Services in a manner reasonably believed to be in the best interests of Chevron and with such care as a reasonably prudent provider of similar services would use under similar circumstances. Supplier shall perform the Services in a safe, diligent, skillful and workmanlike manner, in accordance with generally accepted industry practices and sound engineering principles and will utilize for the Services the technical competence, financial capacity, management skills, competent and qualified personnel and equipment necessary to carry out its duties and responsibilities. Supplier further warrants to Chevron any additional warranties contained in a Statement of Work (SOW).

**5.1.3 Manufacturers' Warranties and Notice of Recall.** Supplier shall assign or cause to be assigned to Chevron any manufacturer's warranty, including any design or engineering warranties, which it has received on any Product provided under this Agreement. Supplier shall promptly deliver written notice or verbal, followed by written, notice of any recall of Product. Supplier shall promptly replace any such recalled products as soon as practicable with comparable products not subject to such recall.

**5.1.4 Warranty Period.** The warranty period for both Products and Services shall be the longer of any of the following: (i) eighteen (18) months from the date of acceptance of the Products or the date of completion of performance of Services; (ii) the length of the manufacturer's warranty; or (iii) the length of Supplier's standard warranty for the Products or Services (hereafter referred to as the "Warranty Period").

**5.2 Warranty Remedies.**

**5.2.1 Product Warranty Remedy.** Except as otherwise provided in this Agreement, the Parties agree that Chevron's primary remedy for breach of the above warranties relating to the Products shall be, on an expedited basis and at Supplier's sole expense, for Supplier to repair or replace, or to cause to be repaired or replaced (including removal, installation and other reasonable incidental costs), any Product that contains a defect or non-conformity with the specifications; provided that Chevron shall give notice of each such defect/non-conformity within the Warranty Period specified in Section 5.1.4 following Chevron's acceptance of Product; provided further that the original warranty notice period shall be extended by six (6) months following any repair/replacement.

**5.2.2 Service Warranty Remedy.** Except as otherwise provided in this Agreement, the Parties agree that Chevron's primary remedy for breach of the above warranties relating to the Services shall be, on an expedited basis and at Supplier's sole expense, for Supplier to re-perform, or to cause to be re-performed (including other reasonable incidental costs), the Services that contain a defect or non-conformity with the specifications; provided that Chevron shall give notice of each such defect/non-conformity within the Warranty Period specified in Section 5.1.4 following Chevron's acceptance of the Services or work product; provided further that the original Warranty Period shall be extended by six (6) months following any re-performance.